NEW JERSEY ASSOCIATION FOR CHILDREN WITH LEARN-
ING DISABILITIES, A NEW JERSEY CORPORATION,
PLAINTIFF v. BURLINGTON COUNTY ASSOCIATION
FOR CHILDREN WITH LEARNING DISABILITIES, A
NEW JERSEY CORPORATION, DEFENDANT.

Superior Court of New Jersey
Chancery Division

Decided October 25, 1978.

*Mr. David Jerchower,* attorney for plaintiff (*Mr. Gerald A. Dienst* appearing).

*Messrs. Parker, McCay & Criscuolo,* attorneys for defendant (*Mr. Richard E. Gehret* appearing).

WOOD, J. S. C. Plaintiff New Jersey Association for Children with Learning Disabilities (NJACLD) is a nonprofit corporation of the State of New Jersey having as its object the assistance and conduct of educational programs for children affiliated with certain types of learning disabilities or difficulties. It was originally incorporated as the New Jersey Association for the Brain-Injured Children. The name was changed in 1970 when it received a charter from the Association for Children with Learning Disabilities, a nonprofit corporation with national membership.

Prior to 1969 certain local associations or groups were formed, among them a Burlington County Section, which sought and obtained affiliation with the NJACLD. The genesis of the Burlington County Section was entirely local. One of the prime organizers was Mrs. Josette Melman of Mount Holly, who, in 1965, having a child who was diagnosed as having "minimal cerebal dysfunction," or as being "brain-injured," and seeking help for the child, learned of the existence of the New Jersey Association and set about organizing the group which as stated became known as the Burlington County Section of NJACLD.

At this time the State Association was but recently organized. It had a small headquarters staff, and four or five

other sections had previously been organized throughout the State.

The organization of the NJACLD consisted and still consists of a central headquarters presently located in Convent Station, Morris County, New Jersey, and chapters or sections organized in a number of counties. The Burlington County Section was financed locally. This appears to have been true of the other sections as well. There is no evidence that the State Association had any independent financing, or any revenues at all except such as were contributed, as prescribed by the by-laws  by the several operating sections.

The activities of Burlington County Section, initially consisting of a teen-age theatre workshop and a summer camp established on land in Rancocas State Park, the use of which was granted to the Burlington County Section by the State of New Jersey, were all undertaken and financed without assistance from the state organization. The success of the camp and other activities led the Burlington County Section to conceive the starting of a school.

Again, with the leadership of Mrs. Melman and a few others, the use of a church facility in Lumberton was obtained and a school was started which grew into and became the Midway School, which was approved by the State Department of Education, with local boards of education authorized to send and pay the tuition of children qualified and having the need to participate in its programs.

During the years 1968 to 1976 the Burlington County Section, although operating autonomously, adhered to the constitution and by-laws of the State Association and was recognized as a part thereof. Nevertheless, all its activities were organized and conducted with little supervision or assistance from the State Association. The only assistance rendered by the central organization was the furnishing of certain textbooks and school supplies. A portion of the dues of members of local sections was paid to the central organization.

Sometime prior to 1976 the constitution and by-laws of the State Association were revised. Among other changes in

the organization there was instituted what is referred to as central banking. Prior to this the Burlington County Section maintained its own records and its own bank accounts, received its own revenues and paid its own expenses, including all salaries and operating expenses of its camp and school activities. With the advent of central banking the Section was required to remit all revenues to the State Association, which, in turn, paid all bills of the local sections. The purpose of this system was ostensibly administrative efficiency and the avoidance of multiple book and record keeping by the local sections. However well conceived in theory, the system developed difficulties in practice. There was testimony that considerable revenues received by the Burlington County Section and transmitted to the State Association were not accounted for, and some important expenses of the Section, when forwarded to the State Association, were either paid tardily or were not paid at all.

Dissatisfaction with the operation of the state organization at length led the Burlington County Section to reach the decision that it should sever its association with the State Association and become wholly independent thereof. At a special meeting of the Section membership, called February 27, 1976, the members present unanimously adopted a resolution to "disassociate" from the NJACLD. From that time forward the local organization has discontinued all connection with the New Jersey Association. A nonprofit corporation, Burlington County Association for Children with Learning Disabilities (BCACLD), was formed in June 1976 and has since operated the various continuing projects of the local group, consisting chiefly of the Midway School and the summer camp known as Camp Melpine, with the approval and sanction of the State Department of Education.

The school, having earlier moved from Lumberton to Moorestown, was operated during the school years 1975–1976 and 1976–1977 in quarters rented from St. Matthew Lutheran Church in Moorestown. In 1977–1978 the BCACLD ascertained the availability for rent of the former

NIKE missile base in Lumberton Township and arranged to rent this site. The school was thereupon transferred to and has since been operated at that location. All of this was accomplished on the initiative, first of the members of the local section and later of the BCACLD.

The State Association was not notified of the withdrawal of the Burlington County Section until July 1976 after the incorporation of BCACLD was an accomplished fact. In the meantime, between February and June 1976 the Section continued to send delegates to NJACLD meetings and continued to operate the Midway School and the existing camp programs. Notification was in the form of a letter dated July 6, 1976 and addressed to Anthony Kurinec, president of NJACLD, over the signature of Mrs. Julia C. Air, as President of BCACLD, the full text of which follows:

This is to advise you that the Burlington County Section New Jersey Association for Children with Learning Disabilities, at a special membership meeting February 27, 1976, unanimously voted to withdraw from the New Jersey State Association for Children with Learning Disabilities, and to constitute the County Association as a separate corporation to operate completely independently of the state organization.

On June 7, 1976, a Certificate of Incorporation was approved by the New Jersey Department of State.

Burlington County Association for Children with Learning Disabilities, Inc. has no connection with, and will operate totally independent of the state association.

Kurinec replied by letter demanding an "audit" of all the assets of the Burlington County Section and warning against the continued use by the newly-formed corporation of the title Association for Children with Learning Disabilities. A form letter was addressed to the membership of the Burlington County Section asking individual members to indicate whether they desired to retain their membership in NJACLD. To that inquiry a variety of responses was received, more than half of those who replied indicating their desire to remain as members of NJACLD. No favorable

response being received from the BCACLD, this action was instituted, seeking:

1. Return of and accounting for all property of NJACLD.
2. Damages for use of such property and for loss of good will.

By amended complaint plaintiff also seeks an injunction permanently restraining defendant from using the name and title Association for Children with Learning Disabilities.

It is clear that the Burlington County Section NJACLD had its genesis in and owed its existence to the State Association. The founders of the Section initially sought and were granted membership in NJACLD. They did so with the avowed purpose of sharing in and benefiting from the prestige and influence of the state and national organizations. Indeed, Mrs. Air testified that the new corporation adopted its name because it then desired and presently contemplates affiliation with the national ACLD, although it intends to operate wholly independent of State Association. The Burlington County Section operated as a unit of and subject to the constitution and by-laws of NJACLD from its inception in 1965 until its withdrawal in 1976.

NJACLD is incorporated as a nonprofit corporation of the State of New Jersey. It is governed by its constitution and by-laws. The by-laws mandate both approval of programs and handling of all funds by the state organization. They also provide that materials and equipment are the property of NJACLD. The by-laws also provide for the formation of Sections, of which the Burlington County Section has been one, which operate educational and recreational programs for the benefit of children having need of and qualifying for these services, in accordance with the objective of the state and national associations. Such programs are conducted by the Sections as parts of NJACLD. They are not separately chartered or franchised but otherwise independent units, but are integral parts of the larger whole and as such operate by authority of and are bound by its constitution

and by-laws. The Burlington County Section so existed and operated. Members of the Section served as delegates to a Board of Delegates of the State Association and thus participated directly in the business and operation of NJACLD.

In cases involving disputes within religious organizations it is held by the great weight of authority that a local congregation is never independent, but *ab initio* an integral part of its denomination. While a congregation may act with a certain degree of independence, its property may not be put to use not sanctioned by the denomination to which such congregation belongs. Thus, for instance, a local congregation may not secede and take its property with it even if such secession is by unanimous vote. *Presbytery of Jersey City v. First Presbyterian Church*, 80 *N. J. L.* 572, 579 (Sup. Ct. 1910) ; *Kelly v. McIntire*, 123 *N. J. Eq.* 351 (Ch. 1938).

The same principle must be applied to a local charitable organization, secular in nature, which is an integral part of a larger state or national organization under which it is formed and to which it owes its existence. Such local unit may not secede from the state or national organization and take organizational property with it. It follows, therefore, in the present case, that the members of the Burlington County Section (who, by virtue of such membership, are members of NJACLD), while fully entitled to withdraw from NJACLD if they so desire, may not assume ownership of the property held by the Section and use it for any purpose not sanctioned by NJACLD. *Protestant Episcopal Church, etc. v. Graves*, 161 *N. J. Super.* 230 (Ch. Div. 1978).

The fact that the announced purposes of the newly formed corporation are similar if not identical to those of NJACLD is not, in my judgment, significant here. The fact is that it is the intent and purpose of BCACLD to conduct its activities completely independent of and without regard to the rules, regulations and standards established by NJACLD.

The effect of this is that the property of the Section is presently being held by an unauthorized corporation and used in a manner and for a purpose not sanctioned by NJACLD. All such property is therefore held subject to a constructive trust in favor of NJACLD, *Protestant Episcopal Church, etc. v. Graves, supra.*

Defendant nevertheless argues that except for a small bank account balance and some tangible personal property, consisting of school supplies, furniture and some text books, return of which has been tendered to plaintiff, it has no property which can be said to be held in trust for the NJACLD. Its interest as tenant in the leases of the Lumberton site of the Midway School and its right to operate Camp Melpine on state-owned land are said not to be property which can be claimed by NJACLD. I am constrained to disagree.

██ Both Camp Melpine and Midway School were conceived, organized and, until 1976, operated by the Burlington County Section as an integral part and under the aegis of NJACLD. Their operation, despite the local enterprise and fund-raising previously referred to, was possible because they were in actuality operations of NJACLD and sanctioned by it. The leases of school sites and the contractual agreements under which the camp was operated were property rights inuring to NJACLD. They could not be appropriated and removed from NJACLD by the dissident and seceding members. *Presbytery of Jersey City v. First Presbyterian Church* and *Kelly v. McIntire,* both *supra.* All such property is held by defendant subject to a constructive trust for the parent organization. That the present site of Midway School was leased by BCACLD after the purported secession of the Section makes no difference. It is merely an asset substituted for that held and used by the Burlington County Section. Plaintiff is entitled to a declaration of constructive trust covering not only the original assets but also any increase or profit and any substituted assets. *Kaplan v. Cavicchia,* 107 *N. J. Super.* 201 (App. Div. 1969). Those

assets include the operation of the Midway School and Camp Melpine regardless of the move of either from one site to another and regardless of any change of personnel.

Plaintiff also seeks an injunction against use by defendant of the name Association for Children with Learning Disabilities. It contends that the name is the property of NJACLD and it is entitled to protection against the "pirating" of its name. Defendant argues that the name is not the exclusive property of plaintiff but is generic and simply descriptive of the objectives of the organization, and in any event is not adopted to mislead or confuse or mislead the public, to the plaintiff's damage. I conclude, to the contrary, that whether or not confusion or deception is intended, this is the effect of the adoption of the name by defendant. The designation of "Burlington County" rather than "New Jersey" preceding the title "Association With Learning Disabilities" not only fails to resolve such confusion but rather serves to accentuate it. The title "Association for Children with Learning Disabilities" has nationwide recognition. It may well be assumed by the public that any unit bearing that name is a part of the larger organization and shares its prestige. Indeed, defendant admits as much by the assertion that it desires and intends to seek affiliation with the national ACLD. The conclusion is inevitable that it does indeed intend to benefit from the recognition of the name, to the detriment of the NJACLD. The adoption of the name by this dissident defendant for its own purposes, however charitable those purposes may be, is wrongful and must be enjoined. *Cape May Yacht Club v. Cape May Yacht and Country Club,* 81 *N.·J. Eq.* 454 (Ch. 1913); *Supreme Lodge, etc. Loyal Order of Moose v. Improved Benevolent and Protective Order of Moose,* 98 *N. J. Eq.* 598 (Ch. 1929); *Kline v. Knights of Golden Eagle,* 113 *N. J. Eq.* 513 (Ch. 1933).

Defendant is directed forthwith to surrender and assign to plaintiff all its rights and interest under the lease to the Lumberton Township site of the Midway School and all its

right to and interest in any agreements with respect to the operation of Camp Melpine.

Defendant is further directed to file an accounting of all personal property in its control or possession, including bank accounts, school equipment and supplies, whether acquired from NJACLD or from other sources. Upon the rendering of such accounting, all such assets will be ordered transferred to the plaintiff. The accounting shall be filed with the court within 30 days and a short date for hearing thereon will thereupon be set.

Defendant is permanently enjoined and restrained from using in any manner or for any purpose the name "Association for Children with Learning Disabilities."

Plaintiff also claims damages for use by defendant of plaintiff's property and for the value of good will "appropriated" by defendant. There has been presented no evidence of loss to plaintiff which is susceptible of pecuniary measurement. Plaintiff's claim for damages will therefore be dismissed.

Defendant's counterclaim for damages for "amounts found due and owing following accounting" and for defamation and "malicious prosecution" is without merit and will be dismissed.

No costs.